******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

# RICHARD MALINOWSKI *v.* SIKORSKY AIRCRAFT CORPORATION ET AL.
## (AC 43617)

Bright, C. J., and Alvord and Alexander, Js.

*Syllabus*

The defendants, the employer, S Co., and its insurance carrier, A Co., appealed to this court from the decision of the Compensation Review Board, which affirmed the decision of the Worker's Compensation Commissioner finding that the plaintiff's repetitive workplace activities at S Co. substantially and permanently aggravated a preexisting condition in his knee and denying the defendants' motion for articulation. The plaintiff, who suffered from degenerative arthritis stemming from a work injury he suffered in 1972, and a subsequent surgery in 1973, prior to his employment with S Co., and who ultimately required a total replacement of his left knee, submitted into evidence medical records and correspondence from his treating physician, P. The defendants claimed that the board improperly affirmed the commissioner's award because, inter alia, P's expert opinions were not expressed with reasonable medical probability. *Held*:

1. The board properly affirmed the commissioner's award.

   a. The board properly affirmed the commissioner's finding that P's opinion that there was a causal relationship between the plaintiff's employment and his need for surgery was expressed with a reasonable degree of medical probability; P opined in unequivocal language that the plaintiff's 1972 injury actually had been aggravated by the plaintiff's work at S Co., pulling and pushing pallets of parts weighing 800 to 1400 pounds for shifts of 12 hours, and, although P's notes indicated that the plaintiff's overwhelming medical issue was arthritis and that his need for surgery dated back to his 1973 knee operation, these references did not render P's entire opinion speculative and were not inconsistent with an opinion that the plaintiff's workplace activities at S Co. constituted a substantial contributing factor to the plaintiff's need for surgery because they aggravated the plaintiff's preexisting condition.

   b. The board properly affirmed the commissioner's finding that P's records constituted competent medical evidence from which the commissioner could find a causal relationship between the plaintiff's work activities at S Co. and his need for surgery: P's records reported the plaintiff's condition, symptoms and course of treatment and contained P's expert opinion that the plaintiff's knee injury was causally related to his work, and the defendants did not object to the admission of P's records into evidence, nor did they depose P or call him to testify at the hearing; moreover, P's opinion was not incompetent for a lack of supporting facts, as, although the plaintiff testified that he retrieved the heaviest, 1400 pound fixtures only 20 to 30 times throughout the course of his career, P's opinion was that pushing heavy carts of *up to* 1400 pounds during back-to-back 12 hour shifts contributed to the plaintiff's injury; furthermore, P's medical evidence was supported by other evidence, including the plaintiff's extensive testimony as to his workplace activities pushing carts of heavy parts on a regular basis, which the commissioner found credible.

   c. The commissioner did not improperly refer to the plaintiff's work activities beyond those expressly identified in P's records; the commissioner had before him expert medical evidence that the plaintiff's work at S Co. caused his need for surgery, thus, he was not limited to consider only the activities expressly identified by P but was entitled also to consider the plaintiff's testimony, which in no way undermined the adequacy or competency of P's expert opinion.

2. The board properly affirmed the commissioner's decision to deny the defendant's request for articulation; the commissioner did not abuse his discretion in denying the request, as the finding for which the defendants sought an articulation, that the plaintiff's workplace activities had substantially and permanently aggravated his underlying and preexisting knee condition, when considered together with P's records, reflected

P's opinion that the work activities aggravated the plaintiff's underlying condition.

Argued March 11—officially released September 7, 2021

*Procedural History*

Appeal from the decision of the Workers' Compensation Commissioner for the Eighth District finding that the plaintiff had sustained a compensable injury, awarding certain disability benefits, and denying the motion to correct and for articulation filed by the named defendant et al., brought to the Compensation Review Board, which affirmed the commissioner's decision, and the named defendant et al. appealed to this court. *Affirmed.*

*Lucas D. Strunk*, with whom was *Katherine E. Dudack*, for the appellants (named defendant et al.).

*Donna Civitello*, with whom was *Robert F. Carter*, for the appellee (plaintiff).

*Opinion*

ALVORD, J. The defendant Sikorsky Aircraft Corporation[1] appeals from the decision of the Compensation Review Board (board) affirming the decision of the Workers' Compensation Commissioner for the Eighth District (commissioner). On appeal, the defendant claims that (1) the board erred in affirming the commissioner's finding that the workplace activities of the plaintiff, Richard Malinowski, substantially and permanently aggravated preexisting degenerative arthritis in his left knee, resulting in the need for a total knee replacement,[2] and (2) the commissioner erred in failing to grant its motion for articulation. We affirm the decision of the board.

The following history is necessary for the resolution of this appeal. On February 24, 2012, the plaintiff, who is employed by the defendant, filed a form 30C seeking compensation for an injury to his knees. He noted the date of injury as January 19, 2012, and stated that "[b]oth knees swelled up during the course of work that day . . . ." The hearing before the commissioner was held on April 30, 2015, and May 17, August 10 and November 30, 2016. The commissioner heard the testimony of the plaintiff and received as exhibits, among other documents, medical records and correspondence from Ronald S. Paret, a physician who treated the plaintiff for his knee injuries, the defendant's plant medical facility reports, and deposition transcripts of the plaintiff, Christopher Lena, a physician who evaluated the plaintiff at the request of the defendant, and Sebastian Marino, the plaintiff's former employer.

On June 5, 2017, the commissioner issued his findings and award. The commissioner summarized the plaintiff's testimony as follows. The plaintiff injured his left knee in 1972 while working as a motorcycle mechanic at S. Marino's Honda City (Honda), and he underwent surgery on that knee in November, 1973. A discharge summary referenced a left meniscotomy surgery, and the plaintiff stated that he had the lateral meniscus of his left knee removed.[3] The plaintiff began working for the defendant in February, 1984. He was employed with the job title "Grinder B" for twenty-seven years before he was promoted to "Grinder Specialist."

Between the time he left employment with Honda[4] and 2012, the plaintiff did not have any medical treatment to his left knee or any other left knee injury, except for a laceration over his left kneecap that he sustained while working for a steel company. Between 1973 and 2012, the plaintiff had occasional soreness in his left knee after strenuous exercise, such as running, swimming, and playing basketball. He did not experience swelling.

For twenty-eight years, while employed by the defendant, the plaintiff worked on one of two Springfield

vertical grinders, which are the defendant's largest grinders. The grinders make the main rotor parts and transmission housings for helicopters. The tables on the grinders are approximately five and one-half feet in diameter and they have dual cutting heads on them. The grinder that the plaintiff primarily operated was elevated by six stairs. Depending on the job, he climbed the stairs as often as eight times per hour. He also carried reference rings and gauges, which weighed approximately twenty-five pounds each. When the parts he was grinding weighed less than fifty pounds, he carried them by hand up and down the stairs.

Over the course of the twenty-eight years he worked the grinder, the plaintiff was required to retrieve fixtures. "The fixtures for grinding the transmission housings on the Blackhawk were the heaviest. The original fixture weighed 1400 pounds, but about [10] years ago a new and lighter one (approx[imately] 500 pounds) was made. It was the grinder operator's job to set up every job, which included placing the fixture on the grinder. In order to set up the grinder, he would have to get the fixture out of the fixture crib, which is about 100 yards away from the grinder. If he couldn't get a tow motor operator to get the fixture, he would need to do so with a pallet jack or floor jack. In [28] years he probably needed to get the 1400 pound part about 20 [to] 30 times. . . . Most of the heavy fixtures were stored directly across the aisle from the grinder. However, the operator would need to get a pallet jack and position them so that a crane would be able to lift them onto the grinder. Depending on the job, this could happen two or three times per day."

It could take up to four hours to set up the machine, and the plaintiff spent much of that time bent over. The plaintiff also, at other times, would have to reach out to the grinding table while standing on one leg. On a regular basis, he would push carts containing heavy parts. The plaintiff lifted parts weighing sixty pounds or less by hand and heavier parts by crane.

The plaintiff did not notice any knee problems until January, 2012, when he was lifting parts and working on a gear grinder. He had worked two twelve hour shifts and "both of his knees had blown up by the third day." The plaintiff saw Paret, who drained his left knee. In March, 2012, Paret recommended bilateral knee replacements, but the plaintiff continued working and hoped that his knees would get better. The plaintiff underwent a right total knee replacement surgery on October 30, 2014,[5] and a left total knee replacement surgery on February 19, 2015.

Although Paret did not testify at the hearing, records prepared by him were entered into evidence. The commissioner quoted from a February 8, 2012 report prepared by Paret: "[The plaintiff] is a patient of Dr. Ross-Russell's with a knee swelling. He has had three weeks

of left-sided knee pain. Wednesday to Friday he was working [twelve] hours a day and had gradually increasing swelling in the knee when he was pushing large heavy carts and racks of gears on the floor. He had previously a meniscectomy many, many years ago as a medial meniscectomy back in 1975 with a Dr. Campbell-Jacobs in Middletown but in the meantime he has had no issues ongoing at this point.

"IMPRESSION: This is a work injury. He previously does have substantial damage to the knee from a previous injury although he has bilateral knee arthritis. At this point the effusion is rather significant. I believe it was caused by his work-related efforts pushing very heavy racks of gears working [twelve] hours a day for several days in a row. He has moderately severe degenerative joint disease which has been aggravated now by his work-related injury." (Internal quotation marks omitted.)

The commissioner also noted Paret's further opinion on causation as expressed in a December 16, 2012 letter. The commissioner stated: "[Paret] states that an open left-sided medial meniscectomy from [1973] and arthroscopic meniscectomy on the right side are both substantial contributing factors to the [plaintiff's] progressive arthritic changes regarding both knees. [Paret] goes on to state that the original work injury from [1972] at Honda has been aggravated by his working at [the defendant] and that the [plaintiff's] activities involving the pushing and pulling of heavy pallets of engine and turbine parts are a substantial contributing factor in the aggravation of the [plaintiff's] preexisting left knee condition from a [1972] injury at Honda."

The deposition testimony of Lena, who evaluated the plaintiff at the request of the defendant, was entered into evidence during the hearing. The commissioner summarized Lena's testimony: "A procedure such as the [plaintiff's] left knee open meniscectomy leads to significant arthritis and total knee replacement given that the meniscus absorbs 70 [to] 80 [percent] of the weight when walking, thereby increasing the load on cartilage, which wears away. . . . His review of the [plaintiff's] X-rays and MRI confirmed the existence of advanced osteoarthritis, chronic ACL deficiency and joint effusion consistent with old injury and surgery, and showing that the existence of bone on bone medial compartments was consistent with the prior injury and surgery. . . . In his opinion, the [1972] injury was a substantial contributing factor to the [plaintiff's] left knee condition and the [plaintiff] would need a total knee replacement sooner because of it. Also, the [plaintiff's] work at [the defendant] was a contributing factor, but not a substantial contributing factor."

On the basis of the testimony and documentary evidence, the commissioner made the following findings: "The [plaintiff] had a left knee meniscectomy on

November 26, 1973. . . . The left knee meniscectomy in 1973 was a substantial contributing factor in the [plaintiff's] development of arthritis. . . . The [plaintiff's] repetitive work activities of climbing up and down stairs while carrying heavy parts and fixtures, setting up a grinder while reaching and leaning on one foot, extensive pushing, pulling, reaching and lifting of heavy parts, acted in substantially and permanently aggravating his underlying and preexisting left knee condition, resulting in the need for a total left knee replacement on February 19, 2015. . . . The [plaintiff's] testimony regarding his physical condition and work activities was credible and persuasive. . . . The opinions of . . . Paret were more persuasive than those of . . . Lena, especially with regard to the impact of the [plaintiff's] work activities on his ultimate need for left total knee replacement."[6]

The commissioner ordered the defendant to reimburse the plaintiff for his claimed out-of-pocket expenses and to pay all claimed outstanding medical bills for treatment of the plaintiff's left knee. The commissioner designated Paret as the authorized treating physician for the plaintiff's left knee claim of January 19, 2012.[7] Following the issuance of the commissioner's findings and award, the defendant filed a motion to correct the commissioner's findings and request for articulation, which was denied.

The defendant thereafter appealed to the board, claiming error in the finding and award and in the commissioner's denial of its motion to correct. On appeal to the board, the defendant argued that the commissioner erroneously determined that the plaintiff's need for total left knee replacement surgery was due to repetitive work activities that aggravated his underlying preexisting degenerative changes. The defendant argued that the expert opinion on which the commissioner relied was not based on the evidence, and the commissioner's conclusions were predicated on the fact that the plaintiff performed certain repetitive activities about which the plaintiff's medical expert did not comment. The defendant also argued that the record was devoid of expert testimony that would serve to establish, within reasonable medical probability, the causal link between the plaintiff's work activities and his need for left knee replacement surgery. Finally, the defendant argued that the commissioner improperly denied its motion to correct and request for articulation.

In an August 26, 2019 decision, the board affirmed the decision of the commissioner. It first addressed the defendant's challenge to Paret's opinion. The board referred to instances in which Paret had addressed the causation of the plaintiff's left knee replacement surgery. First, it referred to Paret's February 8, 2012 report of his initial visit with the plaintiff, in which Paret attributed the swelling in the plaintiff's knee to his having

pushed racks of gears for twelve hours for several days in a row. The board noted that "Paret also opined that the [plaintiff's] degenerative disease had been aggravated by the injury, but did not specifically state that the swelling episode caused the need for the total knee replacement." Second, the board referenced Paret's February 15, 2012 report in which he opined that the plaintiff suffered from severe degenerative joint disease in his left knee, and he noted that the " 'overwhelming issue is arthritis' " due to the meniscectomy in 1973. Third, the board referred to a December 16, 2012 letter authored by Paret, in which he noted that the plaintiff " 'has been responsible as a machinist for pulling very heavy loads weighing up to 1400 pounds on pull carts with no mechanical assistance, sometimes for fairly long distances of almost 100 yards.' " The board further noted Paret's opinion that the plaintiff's " 'original work injury from [1972] at Honda [was] actually aggravated by his working at [the defendant].' " Fourth, the board noted Paret's February 6, 2015 office note, which provided that the contemplated left total knee replacement " 'obviously dates back to his [1973] open meniscectomy.' "

The board recognized that, "[w]here . . . it is difficult to ascertain whether or not the disease arose out of the employment, it is necessary to rely on expert medical opinion. Unless the medical testimony by itself establishes a causal relation, or unless it establishes a causal relation when it is considered along with other evidence, the commissioner cannot conclude that the disease arose out of the employment." (Internal quotation marks omitted.) *Murchison* v. *Skinner Precision Industries, Inc.*, 162 Conn. 142, 152, 291 A.2d 743 (1972). Applying this standard, the board determined that it was necessary for the commissioner to rely on expert medical testimony to determine that the plaintiff's left knee meniscectomy in 1973 was a substantial contributing factor in his development of arthritis. Citing *Garofola* v. *Yale & Towne Mfg. Co.*, 131 Conn. 572, 574, 41 A.2d 451 (1945), the board stated that in the absence of expert testimony linking the meniscectomy with the development of arthritis, " '[i]t could not be said to have been a matter of common knowledge that the symptoms described by the plaintiff as having occurred while doing his customary work were related to the injury . . . .' "

The board was not persuaded, however, that the same analysis applied to the commissioner's conclusions as to the role of the plaintiff's workplace activities in substantially and permanently aggravating his condition, resulting in the need for a knee replacement. The board determined that, once it had been established through expert testimony that the plaintiff's medical history rendered him susceptible to arthritis, it was within the commissioner's discretion to infer that the plaintiff's work activities " 'acted in substantially and perma-

nently aggravating his underlying and preexisting left knee condition, resulting in the need for a total left knee replacement . . . .' "

The board noted that the commissioner had before him the extensive testimony of the plaintiff. The board further considered the lack of any evidence in the record that any other activity might have contributed to the plaintiff's knee deterioration or that the plaintiff had experienced any significant medical issues with his left knee prior to January, 2012. The board determined that the commissioner reasonably could have inferred " 'that it was much more likely that the [injury] occurred from the work in which the plaintiff was engaged, arising, as it did, during performance of the work, than that it occurred from some unknown cause.' " See *Garofola* v. *Yale & Towne Mfg. Co.*, supra, 131 Conn. 574.

The board next turned to the medical record, stating that it was "not devoid of support for the commissioner's conclusions relative to the role played by the [plaintiff's] repetitive workplace activities." Specifically, the board stated that both Lena and Paret agreed that the plaintiff's prior injury in 1972 and meniscectomy in 1973 "contributed to the deterioration of the [plaintiff's] left knee over time and his eventual need for a total knee replacement." The board acknowledged that Paret's opinion with respect to the role of the plaintiff's work activities "does appear to be primarily based on his understanding that the [plaintiff] was responsible for pushing and pulling heavy fixtures." It then explained that Lena's deposition testimony was ambiguous as to the role the plaintiff's work activities played in contributing to the deterioration. The board restated Lena's testimony that the plaintiff's employment was a " 'contributing factor, but I don't think it's a substantial contributing factor.' " The board restated Lena's testimony: " 'Is there any contributing factor from his occupation? Absolutely. But it is certainly not the main or substantial contributing factor to it.' " When asked whether the plaintiff's predisposition accelerated the knee deterioration in light of his workplace activities, Lena answered: "It is possible especially if there is a significant exciting event." Finally, when asked whether "being on your feet, walking and pushing and pulling heavy loads for a job for eight hours a day" played a role in the plaintiff's knee deterioration, he responded: "I'm actually impressed that he made it as long as he did."

The board stated that the determination of what constitutes a substantial contributing factor is a question for the commissioner, who was not required to accept Lena's opinion. Moreover, the board stated that "it could be argued that Lena's opinion actually provided a basis, albeit limited, for the commissioner's conclusion that the claimant's repetitive workplace activities did play a role in the development of the claimant's arthritis and

eventual need for knee replacement surgery." Ultimately, the board concluded that the commissioner retained the discretion to make the determination regarding the plaintiff's repetitive workplace activities, "despite some limitations in the medical evidence relative to that particular issue."

Lastly, the board rejected the defendant's claim that the commissioner erred in denying its motion to correct and request for articulation. Accordingly, the board affirmed the findings and orders of the commissioner. Thereafter, the defendant filed a motion for reconsideration and reargument, which the board denied. This appeal followed.

"As a preliminary matter, we note that when the decision of a commissioner is appealed to the [board], the [board] is obligated to hear the appeal on the record of the hearing before the commissioner and not to retry the facts. . . . It is the power and the duty of the commissioner, as the trier of fact, to determine the facts. . . . [T]he commissioner is the sole arbiter of the weight of the evidence and the credibility of witnesses . . . . Neither the . . . board nor this court has the power to retry facts. . . .

"The [board] may not disturb the conclusions that the commissioner draws from the facts found unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . In other words, [t]hese conclusions must stand unless they could not reasonably or logically be reached on the subordinate facts. . . . Our scope of review of the actions of the [board] is similarly limited. . . . The decision of the [board] must be correct in law, and must not include facts found without evidence or fail to include material facts which are admitted or undisputed." (Citations omitted; internal quotation marks omitted.) *O'Connor* v. *Med-Center Home Health Care, Inc.*, 140 Conn. App. 542, 547–48, 59 A.3d 385, cert. denied, 308 Conn. 942, 66 A.3d 884 (2013).

I

We first address the defendant's claim that the board erred in affirming the commissioner's finding that the plaintiff's need for a left total knee replacement was due to repetitive work activities that substantially and permanently aggravated the underlying preexisting degenerative changes in his knee. The defendant presents three principal arguments in support of its claim that the plaintiff failed to prove a causal relationship between his employment and his need for surgery. First, it argues that Paret's opinions were not expressed with reasonable medical probability. Second, it argues that "there is no competent medical opinion in the record tied to the plaintiff's actual job duties," where Paret's opinion incorrectly assumed that the pulling of 800 to

1400 pound parts was performed on a regular basis. Third, it contends that the commissioner improperly referenced work activities of the plaintiff that were not commented on by Paret. We examine each argument in turn.

Our review of the record reveals that the following evidence was presented before the commissioner. The plaintiff introduced office notes, reports, and correspondence, collectively records, authored by his treating physician, Paret. On February 8, 2012, Paret, following his initial meeting with the plaintiff, noted that the plaintiff had developed bilateral knee effusion and stated: "This is a work injury. He previously does have substantial damage to the knee from a previous injury although he has bilateral knee arthritis. At this point the effusion is rather significant. I believe it was caused by his work-related efforts pushing very heavy racks of gears working [twelve] hours a day for several days in a row. He has moderately severe degenerative joint disease which has been aggravated now by his work-related injury." In his February 15, 2012 office note, Paret stated that the MRI showed that the plaintiff "really does have bone-on-bone." Paret continued: "There is some edema in the subchondral region particularly of the proximal tibial plateau and at this point although he does have significant meniscal tears, I believe his overwhelming issue is the arthritis." Paret diagnosed the plaintiff with "severe degenerative joint disease." He stated that "[a]pparently his original medial meniscectomy stemmed from a work injury which he is in the process of reactivating at this point and apparently does have an attorney involved in this situation. It is my opinion that if that medial meniscus was actually related to a [workers' compensation] injury then clearly this arthritis [is] secondary to a [w]orker's [c]ompensation episode." In a March 14, 2012 office note, Paret recorded his impression that the plaintiff has "a large effusion likely secondary to his rather severe degenerative arthritis." The note stated that the plaintiff was "considering surgical options of a total knee replacement as I think there is very little else that we can offer other than the very conservative management treatment course which has been ineffective so far."

In his March 19, 2012 office note, Paret recorded his impression that the plaintiff "has a huge effusion and a moderately severe degenerative arthritis as well as [X]-rays indicating medial joint line closure." Paret noted his recommendation of a knee replacement and stated that the plaintiff was due to return in July, at which time Paret believed there would be "no further ability to prescribe narcotic agents as a long-term solution to knee degenerative joint disease." In a July 13, 2012 office note, Paret recorded the plaintiff's chief complaint as "[b]ilateral knee degenerative joint disease," indicated "extreme tenderness" in the plaintiff's left knee, and stated that "[r]eview of the [X]-rays show

moderately severe degenerative arthritis." In an August 21, 2012 office note, Paret recorded the plaintiff's chief complaint as "[k]nee pain on the left side." Paret stated that the plaintiff "had a [work-related] injury and [is] still having significant issues with both lower extremities which are both work injuries." Paret recorded his impression of "[b]ilateral knee degenerative joint disease" and stated that the plaintiff was "considering timing of a total knee replacement which is believed will be his ultimate solution for his current situation, pain and his [workers' compensation] injury." In a November 27, 2012 office note, Paret wrote that "[t]here is a definite medial joint line narrowing, tenderness and osteophytes are palpable underneath of the skin." Paret's recommendation stated: "With bilateral knee degenerative joint disease . . . that he has elected at this point to pursue the avenue of a total knee replacement . . . ."

The commissioner also had before him Lena's medical report dated August 1, 2012. Lena described the plaintiff as having "a long-standing history of problems with his knee" and stated that the plaintiff "had prior left knee surgery done in 1973 during which he had a large open incision and an open medial meniscectomy." Lena recorded the plaintiff's description of an incident "that occurred on [January 19, 2012] where his knee appeared to just swell up on him. He describes a swelling of both the left and right knee after two [twelve] hour shifts at work. He notes that his work as a machinist was very demanding on his knees especially as his age advanced. He describes having to pull heavy objects, bending over, kneeling often. He describes having to push large heavy carts and racks of gears on the floor." Lena stated: "After the described injury date of [January 19, 2012], he did follow up with Dr. Ronald Paret, who felt that it was a work-related injury, that although he did have significant damage to the knee from previous injury, he felt that this was an aggravation of his underlying condition." Lena reported that an MRI revealed, inter alia, "advanced tricompartmental osteoarthritis [and] large joint effusion . . . ." Lena's assessment was that the plaintiff's open meniscectomy in 1973 on the left side and the arthroscopic meniscectomy in 1985 were "significant contributing factors to his progressive arthritic changes in the knees and his need for knee replacements . . . ." Lena stated: "The right one I do believe is related [to] a work-related injury specifically the 1985 injury during which the meniscus was removed which has led to progressive deterioration and arthritic changes that he is currently experiencing, and the left one related to 1973 incident with an open medial meniscectomy the predication for a progression of arthritic changes, is he has progressed as one would expect to his bone-on-bone contact." Lena concluded: "I believe that the previous meniscectomies were the substantial contributing factor to his development for arthritic

changes and has led to the chronic degenerative changes that he currently has and that is the major cause for the need for the knee replacement and not the pushing and pulling from January of 2012."

In a letter dated December 16, 2012, Paret responded to Lena's evaluation and offered his own opinions. Paret stated that the plaintiff "has been responsible as a machinist [for the defendant] for pulling very heavy loads weighing up to 1400 pounds on pull carts with no mechanical assistance, sometimes for fairly long distances of almost 100 yards." He further described the plaintiff's work activities as "heavy pulling and pushing of pallets of engine and turbine parts weighing 800 to 1400 pounds . . . ." Paret explained that the "open left-sided medial meniscectomy from 1973 and arthroscopic meniscectomy on the right side . . . both are significant contributing factors to his progressive arthritic changes of his knee on both sides." He offered his opinion that the plaintiff's "original work injury from [1972] . . . has been actually aggravated by" his working at the defendant, stating that "I believe that this is a work injury not wholly and exclusively related to [the defendant]." Paret stated his opinion that both knees are "work-related," with the left knee "related to a Honda [workers' compensation] injury and then subsequent aggravation working" at the defendant. Paret concluded by stating: "It is in my opinion illogical to opine that the 1985 injury at [the defendant] and subsequent pulling and pushing activities are a contributing factor to his right-sided knee issue but that the same pulling and pushing is not related to his left knee degenerative arthritis which did start as a workers' compensation injury for Honda . . . ."

In a January 22, 2013 office note, Paret stated that "[e]xamination of both knees shows significant degenerative arthritic changes" and noted that the left knee had "a moderately severe effusion today." In a February 7, 2014 office note, Paret stated that the plaintiff had experienced "two weeks of significant increasing pain where he indicates he has 'a complete breakdown' of his knees." Paret stated that "[p]revious [X]-rays indicate severe bilateral degenerative changes of his knees. His left is much more severe than the right. . . . [A]t this point in time he has elected a total joint replacement . . . ."

In an April 4, 2014 office note, Paret stated that the plaintiff had "failed nonsteroidal anti-inflammatory agents of three different varieties" and is pursuing a total knee replacement. He noted that the plaintiff "is unable to pursue his normal and usual activities because of his rather severe degenerative changes in both knees." In a February 6, 2015 office note, which was subsequent to the plaintiff's right knee replacement, Paret stated that "[h]is persisting issue is his left knee which is also due to a [w]orkers' [compensation] epi-

sode with AIG dating back to 1972 and he is having at least as much difficulty, if not more, on the left now than he is on the right." Paret stated that "X-rays of the left knee show severe degenerative arthritis of this left knee, particularly medial joint line and patellofemoral articular surface with osteophytes throughout the knee." Paret stated that the plaintiff was "strongly considering surgical intervention as soon as possible which in my opinion obviously dates back to his [1973] open meniscectomy and [w]orkers' [c]ompensation injury also at AIG as previously mentioned, which apparently surgery was done by Dr. Richard Campbell-Jacobs."

The commissioner also had before him Lena's deposition testimony. Lena testified as to the general consequences of a complete meniscectomy, stating that it normally leads to the need for a total knee replacement. He testified that if he were giving a rating following a meniscectomy, he would "include in the rating the fact that the patient would in their lifetime require a knee replacement at an earlier time frame secondary to the injury and subsequent complete meniscectomy."

When asked whether the plaintiff related to Lena any specific injuries following the 1972 and 1985 incidents, Lena replied that the plaintiff "denie[d] any other issues except for the [January 19, 2012 incident] where he just had increased swelling in the knee after working twelve hour shifts." Lena testified that the plaintiff was a candidate for knee replacement. He explained that he looks at the radiographic parameters to see whether someone is a candidate for a knee replacement, and noted that "[s]ome people with this much arthritis have no pain and you get the X-rays and you're very surprised that they have no discomfort."[8] Lena testified that his physical examination of the plaintiff revealed the "palpable osteophytes, some swelling inside his knee, 2+ effusion on the left hand side, crepitation, which is when you wear through the lamina splendens you get grinding in the knee. And so it was basically an arthritic knee."

When asked whether the injury the plaintiff sustained in 1972, was a substantial contributing factor in the plaintiff's current condition, Lena responded: "Yes. I believe the total meniscectomy that he had in 1973, at that point in time, if I did a rating on his knee, it would have indicated that in his lifetime he would get a knee replacement at an earlier stage than if he did not have that injury." He further testified that if the plaintiff "did not have the [1972] injury and he worked a couple twelve hour shifts at [the defendant] in 2012, I do not think he would have the same arthritic changes nor a need for knee replacement." He concluded that the plaintiff's work at [the defendant] was "a contributing factor, but . . . [not] a substantial contributing factor. I think the substantial contributing factor is the [1972] injury."

When asked whether Paret believed that the plain-

tiff's work activities were a substantial contributing factor in the plaintiff's need for total knee replacement, Lena testified: "He's kind of going back and forth a little bit about it. If he's going to say that, then he would say that anyone in [the plaintiff's] position would therefore get a knee replacement if they're employed there for the same amount of time. . . . That's why when I say if someone gets a total meniscectomy, I guarantee that they'll get a knee replacement in the earlier stage. I anticipate that there are other people employed by [the defendant] in his position that are not getting knee replacements. So, for that to be the substantial contributing factor I don't think is correct." He summarized: "Is there any contributing factor from his occupation? Absolutely. But it is certainly not the main or substantial contributing factor to it."

When asked whether the plaintiff's work accelerated his need for a knee replacement, Lena stated that "[i]t is possible especially if there is a significant exciting event." He further stated that he was "actually impressed that he made it as long as he did. Because after the [1973] meniscectomy, I would have expected severe arthritis within ten years, and I guarantee he had it. But he lived with it and he still continues to live with it." In response to a question as to whether he agreed with Paret, Lena testified: "It's pretty close. He seems to feel that the significant contributing factor is just the work in between the work at [the defendant]. What he's saying is that anyone in his position will get knee replacements period. When you hire someone you put money aside for knee replacements, and I disagree with that."

The commissioner also had before him the plaintiff's testimony, both during his deposition, taken in 2012, and at the hearing, held in 2015. The plaintiff testified as to his injury in 1972, and surgery in 1973. He testified that, following his surgery, he occasionally had soreness in his left knee but no swelling until January, 2012. The plaintiff testified to his work activities at the defendant. Specifically, during his deposition, he described his work for twenty-six years on the Springfield grinder, in which position he was responsible for "cutting whatever parts they needed to be cut." The plaintiff explained the process for retrieving fixtures, which served as a base for the part. The fixtures were changed for every job. The plaintiff described the fixtures as weighing between 500 and 1400 pounds.[9] He was responsible for retrieving the fixtures from a fixture crib located approximately 100 yards away. He testified: "If we couldn't get a tow motor operator to get it, we would go up there with a pallet jack or a floor jack and lift it up and bring it down to the machine, you know, pull it down, so." The plaintiff explained that the pallet jack, alternatively called a floor jack, pump jack, or hand truck, is a hydraulic jack that you pump with your foot. The plaintiff stated that he moved the 1400 pound fixture approximately 20 to 30 times during his career.

With respect to the lighter fixtures, the plaintiff testified that, "once we got them down, we'd store them across the aisle so we wouldn't have to move them or nobody would have to get them. But in order to set up the job you would have to get a pallet jack and go get the fixture which was across the aisle because the crane couldn't get to that position to lift up the fixture." He testified that he would get the fixture from across the aisle every day, sometimes two or three times per day depending on the jobs to be performed. He explained the process of moving the fixture into place for the crane to pick it up and then setting up the machine, including putting the fixture in and loading the part.

With respect to the parts, the plaintiff testified in his deposition that "the parts would go [800 to 900] pounds," and that he would bring the part in "on a hand truck, put that in the aisle, unload that, climb up six . . . stairs, load that up onto the fixture, and adjust everything on the machine, guards and stuff, and set up and make the cut." The plaintiff confirmed that he moved parts weighing 600 to 700 pounds by himself using just a hand truck, which he described as a pallet jack.

The plaintiff testified before the commissioner that his work in the gear room was a "physically demanding job." He was responsible for pushing racks of gears weighing 800 pounds from one room to another, approximately 100 yards distance. The plaintiff also explained his work with a blank checker, which he described as an approximately 1000 pound tool used to measure gears. He testified that because the wheels on the blank checker were too small and had flat spots on them, he had to exert himself to get the blank checker moving. He explained that he did have help to move the blank checker and that he also would help other people push the blank checker. Overall, the plaintiff explained that his work in the gear room was physically lighter than his work on the Springfield grinder.

The plaintiff described the incident in January, 2012, that led to his knees swelling. He testified in his deposition that he had been "moving gears from one gear room to the large gear cell. Just over the course of the night, the second night . . . both of my knees swelled up, blown up. I moved a blank checker that checks gears out of the way, moved that from one room to another. Doesn't roll very easily. It generally takes two people, but I guess I was feeling good. You know, you only get the burning sensation in your knee, you don't get the extreme pain. Moving large stacks of gears around so I could get gears to my machine to set them up and run. But by the end of—started working the [twelve hour] day on Wednesday . . . [b]y the end of Thursday night, both of my knees were swollen up." He testified that he went to see Paret on February 8, 2012, and Paret drained his left knee. When asked

whether Paret told the plaintiff that the overwhelming issue was arthritis in his knees, the plaintiff responded that Paret "explained to me that it was a bone on bone contact on both knees."

Having received the foregoing evidence, the commissioner made the following findings: "The [plaintiff] had a left knee meniscectomy on November 26, 1973. . . . The left knee meniscectomy in 1973 was a substantial contributing factor in the [plaintiff's] development of arthritis. . . . The [plaintiff's] repetitive work activities of climbing up and down stairs while carrying heavy parts and fixtures, setting up a grinder while reaching and leaning on one foot, extensive pushing, pulling, reaching and lifting of heavy parts, acted in substantially and permanently aggravating his underlying and preexisting left knee condition, resulting in the need for a total left knee replacement on February 19, 2015. . . . The [plaintiff's] testimony regarding his physical condition and work activities was credible and persuasive. . . . The opinions of . . . Paret were more persuasive than those of . . . Lena, especially with regard to the impact of the [plaintiff's] work activities on his ultimate need for left total knee replacement."

In its decision following the defendant's appeal, the board first stated that it was not persuaded that it was necessary for the commissioner to rely on expert opinion in order to determine that the plaintiff's workplace activities had substantially and permanently aggravated his left knee condition, and it performed an analysis under *Garofola* v. *Yale & Towne Mfg. Co.*, supra, 131 Conn. 574. See footnote 2 of this opinion. However, the board also stated that "the medical record is not devoid of support for the commissioner's conclusions relative to the role played by the [plaintiff's] repetitive workplace activities." It ultimately described the record as reflecting "some limitations in the medical evidence relevant to that particular issue."

A

In support of its claim on appeal that the board erred in affirming the commissioner's finding that the need for the plaintiff's knee replacement was due to repetitive work activities, the defendant first argues that Paret's opinions were not expressed with reasonable medical probability. The plaintiff responds that "Paret's opinion that the repetitive trauma caused by the plaintiff's work for the defendant, in the setting of prior bilateral meniscectomies, was a significant contributing factor to the need for arthroplasty for both knees was expressed with certainty, without expressions of conjecture or speculation." We agree with the plaintiff.

We first discuss the general requirement of causation in workers' compensation cases. "To recover under the [Workers' Compensation Act, General Statutes § 31-275 et seq.], an employee must meet the two part test

embodied in . . . § 31-275, namely, that the injury claimed arose out of the employee's employment and occurred in the course of the employment. . . . [I]n Connecticut traditional concepts of proximate cause constitute the rule for determining . . . causation [in a workers' compensation case]. . . . An actual cause that is a substantial factor in the resulting harm is a proximate cause of that harm. . . . The finding of actual cause is thus a requisite for any finding of proximate cause." (Citation omitted; internal quotation marks omitted.) *Marandino* v. *Prometheus Pharmacy*, 294 Conn. 564, 591, 986 A.2d 1023 (2010). "[T]he determination of whether the substantial factor test has been satisfied is a question of fact. . . . If reasonable minds can disagree as to whether the [claimant] has satisfied her burden of establishing proximate cause . . . we will not disturb the commissioner's finding even if we might reach a different conclusion." (Citation omitted; internal quotation marks omitted.) *Wilson* v. *Maefair Health Care Centers*, 155 Conn. App. 345, 355, 109 A.3d 947 (2015).

For expert medical opinion to be admissible in establishing causation, it must be based on reasonable probabilities. In *Struckman* v. *Burns*, 205 Conn. 542, 554–55, 534 A.2d 888 (1987), our Supreme Court rejected the proposition that an expert must use certain formulaic words to state an opinion and explained: "Expert opinions must be based upon reasonable probabilities rather than mere speculation or conjecture if they are to be admissible in establishing causation. . . . To be reasonably probable, a conclusion must be more likely than not. . . . Whether an expert's testimony is expressed in terms of a reasonable probability that an event has occurred does not depend upon the semantics of the expert or his use of any particular term or phrase, but rather, is determined by looking at the entire substance of the expert's testimony. . . . When reports are the substitute for testimony, the entire report should be examined, not only certain phrases or words." (Citations omitted.)

Considering Paret's records as a whole, we agree with the plaintiff that his opinion was based on a reasonable probability. Paret's opinion is most succinctly stated in his December 16, 2012 letter, referenced by the commissioner in his findings, responding to Lena's examination. Lena had concluded that the plaintiff's need for a left knee replacement was related to the 1973 open medial meniscectomy. Specifically, Lena concluded that "the previously meniscectomies were the substantial contributing factor to his development for arthritic changes and has led to the chronic degenerative changes that he currently has and that is the major cause for the need for the knee replacement and not the pushing and pulling from January of 2012." Paret responded that the plaintiff's original work injury from 1972 "has been actually aggravated by his working at [the defendant]."

He described the plaintiff's work as "subsequent heavy pulling and pushing of pallets of engine and turbine parts weighing 800 to 1400 pounds," explaining that such work was a significant contributing factor to the plaintiff's right knee injuries.[10] He then remarked that it was illogical to opine that the pulling and pushing activities were a "contributing factor" to his right knee injury but that the "same pulling and pushing is not related to his left knee degenerative arthritis . . . ."[11] Other of Paret's notes reflect his opinion as to the connection between the plaintiff's workplace activities and the aggravation of his arthritis. For example, on February 8, 2012, Paret wrote, in an office note also referenced by the commissioner in his findings, that the plaintiff's "moderately severe degenerative joint disease" had been "aggravated now by his work-related injury," and referenced the twelve hour days pushing racks of gears. Thus, we are satisfied that his opinion was based on a reasonable probability.

The defendant points to two notations in Paret's records that were not referenced by the commissioner in his findings. First, it cites Paret's February 15, 2012 notation: "[A]lthough [the plaintiff] does have significant meniscal tears, I believe his overwhelming issue is the arthritis." Second, it cites Paret's February 6, 2015 notation: "[The plaintiff] is, at this point, strongly considering surgical intervention [on his left knee] as soon as possible which in my opinion obviously dates back to his [1973] open meniscectomy . . . ."

We are not persuaded that Paret's references to arthritis as the "overwhelming issue" and the plaintiff's need for surgery as dating back to the meniscectomy render his entire opinion speculative. More specifically, Paret's references to the plaintiff's meniscectomy and resulting arthritis are not inconsistent with an opinion that his workplace activities constituted a substantial contributing factor to the plaintiff's need for surgery because they aggravated the plaintiff's preexisting condition. "It is well established that an employer takes the employee in the state of health in which it finds the employee. . . . [A]n injury received in the course of the employment does not cease to be one arising out of the employment merely because some infirmity due to disease has originally set in action the final and proximate cause of the injury. . . . If the injury is the cause of the disability, it is compensable even though such an injury might not have caused the disability if occurring to a healthy employee or even an average employee." (Citation omitted; internal quotation marks omitted.) *Wilson* v. *Maefair Health Care Centers*, supra, 155 Conn. App. 356 n.9.

The defendant relies on the decision of the board in *Ivan-Marrotte* v. *State*, No. 3599, CRB 02-97-04 (July 28, 1998), which is distinguishable from the present case. In *Ivan-Marrotte*, the plaintiff was in the course

of her employment when she chased a group home client over a wall and landed on her left leg. She later claimed that she developed right leg problems as a result of the left leg injury. The commissioner concluded that the plaintiff's phlebitis in her right leg was caused by the injury to her left leg. The board reversed the decision of the commissioner, finding it unsupported by the medical evidence. The board noted that the doctor who offered an opinion on the plaintiff's condition had testified during his deposition that "there certainly is a lot of room for speculation" as to what led up to the plaintiff's right leg symptoms, conceded that reasonable doctors trained in vascular conditions might disagree on the medical cause of the plaintiff's right leg symptoms, and stated that "[i]t would be very difficult to tell" whether jumping off the wall caused the plaintiff's right leg symptoms. In contrast with the expert's testimony in *Ivan-Marrotte*, Paret's opinion in the present case lacked the equivocal language of an opinion improperly based on speculation and conjecture. Indeed, Paret opined that the plaintiff's original work injury from 1972 "has been actually aggravated by his working at [the defendant]."

The defendant argues that "[t]he only medical opinion in the record that was expressed with reasonable medical probability was . . . Lena, who was of the opinion that [the] plaintiff's work activities were not a substantial contributing factor in permanently aggravating [the] plaintiff's degenerative disease." (Emphasis omitted.) The commissioner, however, found Paret's opinion more credible and persuasive than that of Lena. It is well established that "[i]t is the quintessential function of the finder of fact to reject or accept evidence and to believe or disbelieve any expert testimony. . . . The trier may accept or reject, in whole or in part, the testimony of an expert." (Internal quotation marks omitted.) *Chesler* v. *Derby*, 96 Conn. App. 207, 218, 899 A.2d 624, cert. denied, 280 Conn. 909, 907 A.2d 88 (2006).

Accordingly, we conclude that Paret's opinion that there was a causal relationship between the plaintiff's employment and his need for surgery was expressed within a reasonable degree of medical probability.

B

The defendant next argues that the commissioner's causation finding was not supported by competent medical evidence because Paret incorrectly assumed that the pulling of 800 to 1400 pound parts was performed on a regular basis. We disagree.

The following additional facts are relevant. Paret, in his December 16, 2012 letter, described the plaintiff's work activities as "heavy pulling and pushing of pallets of engine and turbine parts weighing 800 to 1400 pounds." Paret also stated, in that same correspondence, that the plaintiff "has been responsible as a

machinist [for the defendant] for pulling very heavy loads weighing up to 1400 pounds on pull carts with no mechanical assistance, sometimes for fairly long distances of almost 100 yards."[12] The commissioner, in his findings, referenced the plaintiff's testimony that he retrieved the 1400 pound part approximately 20 to 30 times in his career and that when he could not get a tow motor operator to get the fixture, he would need to do so with a pallet jack or floor jack. The commissioner further referenced the plaintiff's testimony regarding his retrieval of the fixtures stored across the aisle from the grinder. Depending on the job, he would need to retrieve the part two or three times per day and use a pallet jack to position the fixture so that a crane could lift it onto the grinder. The commissioner found the plaintiff's testimony regarding his work activities credible and persuasive.

In reviewing the defendant's argument, we consider our Supreme Court's decision in *Marandino* v. *Prometheus Pharmacy*, supra, 294 Conn. 588, instructive. In *Marandino*, our Supreme Court considered whether the commissioner properly relied on a medical report from the plaintiff's attending physician in determining that the plaintiff's knee injury was compensable. The defendant had contended that the report was not supported by competent evidence on which the commissioner could rely. Id. The report stated the opinion of the plaintiff's attending physician that the plaintiff's knee injury, which she sustained while falling down the stairs at her home, was caused by a previous, work-related arm injury. Id., 569–70, 588. Specifically, the record contained an April, 2002 letter authored by the plaintiff's attending physician that provided: "I am responding to your . . . correspondence regarding your client and my patient, [the plaintiff]. Please be advised that we have recommended surgery and this dates back to [February, 2002]. I talked specifically with the [plaintiff] that she had an osteochondral lesion [in her knee]. This is a direct result of her previous work-related trauma and as such is a continuation of her ongoing problems. This does not represent a new condition."[13] (Emphasis omitted; internal quotation marks omitted.) Id., 588. The commissioner determined that the attending physician had reported that the knee injury was caused by the arm injury and found such report, which was uncontradicted, persuasive. Id., 589–90.

On appeal, this court determined that the expert medical evidence in the record was not competent, in that it was grounded in speculation and conjecture. *Marandino* v. *Prometheus Pharmacy*, 105 Conn. App. 669, 680, 939 A.2d 591 (2008), rev'd in part, 294 Conn. 564, 986 A.2d 1023 (2010). Specifically, this court stated that there was nothing in the attending physician's reports "to suggest that the arm injury, rather than some other source, was a substantial factor in bringing about the

knee injury"; id.; and that the physician's opinion regarding causation was "merely a statement devoid of a basis in fact . . . ." Id., 681.

Our Supreme Court reversed in part the judgment of this court, concluding that the attending physician's expert opinion was competent despite his failure to include supporting medical facts. *Marandino* v. *Prometheus Pharmacy*, supra, 294 Conn. 594. It first explained that "the facts on which an expert relies for his medical opinion is relevant to determining the admissibility of the expert opinion, but once determined to be admissible, there is no rule establishing what precise facts must be included to support an expert opinion." Id. It then stated that "[o]nce [the expert's] report was admitted into evidence, the trier of fact—the commissioner—was free to determine the weight to be afforded to that evidence." Id. The court noted that "[i]f the defendants sought to challenge the credibility or weight to be afforded to [the attending physician's] expert opinion of causation they could have done so by deposing him prior to the hearing or calling him as a witness at the hearing." Id. The defendants had done neither. Accordingly, the court determined that the commissioner's reliance on the attending physician's expert opinion was reasonable. Id.

We conclude in the present case that the commissioner had before him competent medical evidence from which he could find a causal relationship between the plaintiff's work activities and his need for surgery.[14] Specifically, the commissioner had before him the records of the plaintiff's treating physician, Paret, in which he reported the plaintiff's condition, symptoms, and course of treatment. See *Keenan* v. *Union Camp Corp.*, 49 Conn. App. 280, 285, 714 A.2d 60 (1998) (letters and reports from treating physician that detailed plaintiff's medical condition, symptoms, and course of treatment was competent evidence to support commissioner's finding that fall down stairs at plaintiff's residence was caused by leg weakness resulting from workplace injury). Contained in those records was Paret's expert opinion that the plaintiff's knee injury was causally related to his work. The defendant did not object to the admission of Paret's records into evidence, nor did it depose Paret prior to the hearing or call him as a witness at the hearing. As in *Marandino*, once Paret's reports were admitted into evidence, "the trier of fact—the commissioner—was free to determine the weight to be afforded to that evidence." *Marandino* v. *Prometheus Pharmacy*, supra, 294 Conn. 594. Although the defendant sought to challenge Paret's opinion with the deposition transcript of Lena, the commissioner found Paret's opinion more persuasive. Accordingly, we cannot conclude that the commissioner's reliance on Paret's expert opinion was unreasonable.

Moreover, the defendant's contention that the plain-

tiff only retrieved the heaviest of the fixtures—the 1400 pound fixture—on 20 to 30 occasions over the course of his career does not necessitate a determination that Paret's opinion was incompetent. First, although the board recognized that Paret's opinion regarding causation "does appear to be primarily based on his understanding that the claimant was responsible for pushing and pulling heavy fixtures," we do not construe Paret's opinion as limited to the pushing and pulling of the *1400 pound* fixture. It is significant that Paret, in the same communication referencing the "heavy pulling and pushing of pallets of engine and turbine parts weighing 800 to 1400 pounds," also described the plaintiff's duties as pushing and pulling parts weighing *up to* 1400 pounds. Paret opined that heavy pushing and pulling contributed to the plaintiff's left knee degenerative arthritis. This opinion is consistent with Paret's initial assessment that the effusions in the plaintiff's knees were work-related and caused by the plaintiff pushing large heavy carts and racks of gears on the floor during back-to-back twelve hour shifts, as reported to Paret by the plaintiff. We conclude therefore, in line with *Marandino*, that Paret's opinion was not incompetent for lack of supporting facts.

In addition to the competent medical evidence supporting the commissioner's finding of causation, we also look to the other evidence in the record. Our Supreme Court in *Marandino* explained that "it is proper to consider medical evidence *along with all other evidence* to determine whether an injury is related to the employment." (Emphasis in original.) *Marandino* v. *Prometheus Pharmacy*, supra, 294 Conn. 595. The court determined that the plaintiff's testimony regarding the circumstances of her injury "corroborated [the expert's] medical opinion." Id. Considering the expert opinion "along with the other evidence," the court concluded that the commissioner properly determined that the plaintiff's knee injury was causally related to her employment. Id.

In the present case, the plaintiff testified extensively, both at his deposition and at the hearing, as to his workplace activities, and the commissioner referenced such testimony in his findings. Specifically, the commissioner referred to the plaintiff's testimony regarding the retrieval of the 1400 pound fixture on 20 to 30 occasions, his retrieval of other heavy fixtures stored directly across the aisle from the grinder, a task that the plaintiff might perform 2 or 3 times per day, and the pushing of carts with heavy parts on a regular basis. This testimony, found credible by the commissioner, corroborated Paret's opinion with respect to the extensive pushing and pulling of heavy parts as part of the plaintiff's workplace activities.[15] See *Glenn* v. *Stop & Shop, Inc.*, 168 Conn. 413, 419, 362 A.2d 512 (1975) (commissioner's finding that repetitive heavy lifting required by employment was causally connected with degenerative disc in

plaintiff's lower lumbar spine was not so unreasonable as to justify judicial interference, where treating physician testified that there was causal connection between heavy lifting and plaintiff's condition and plaintiff testified as to nature of his work, his increasing pain, and his ultimate disability).

Accordingly, we conclude that the commissioner had before him competent medical evidence in the form of Paret's records.[16]

C

We next turn to the defendant's contention that the commissioner improperly referenced work activities as "substantially and permanently aggravating [the plaintiff's] underlying and preexisting left knee condition" that were not commented on by Paret. We preface our discussion by reiterating that we already have concluded that the commissioner's ultimate determination—that the plaintiff's need for surgery was caused by his work—is supported by competent medical evidence. In light of that determination, we conclude that the commissioner's reference to the plaintiff's work activities beyond those expressly identified by Paret in his records, was not improper.

In its findings, the commissioner stated that the following repetitive work activities substantially and permanently aggravated the plaintiff's left knee injury: "[C]limbing up and down stairs while carrying heavy parts and fixtures, setting up a grinder while reaching and leaning on one foot, extensive pushing, pulling, reaching and lifting of heavy parts." The defendant argues that although the "plaintiff's testimony supports all but the last of those activities, it is emphasized that none of the actions were commented on by the plaintiff's treating physician . . . Paret."

Although the climbing, reaching, leaning, and lifting activities were not expressly identified by Paret as having aggravated the plaintiff's left knee injury, Paret's records provide the commissioner with the basis to find a causal connection between the plaintiff's work and his need for surgery. As our Supreme Court stated in *Marandino*, "there is no rule establishing what precise facts must be included to support an expert opinion." *Marandino* v. *Prometheus Pharmacy*, supra, 294 Conn. 594. Paret was not required to exhaustively chronicle every workplace activity of the plaintiff that formed the factual basis for his opinion that the plaintiff's work was a substantial contributing factor to his need for surgery. Correspondingly, the commissioner, having before him expert medical evidence that the plaintiff's work caused his need for surgery, was not limited in his consideration to only those activities expressly identified by Paret but instead was entitled to consider the plaintiff's testimony, as set forth at length previously in this opinion. See id., 595 ("it is proper to consider

medical evidence *along with all other evidence* to determine whether an injury is related to the employment" (emphasis in original)). Moreover, the fact that the commissioner considered the plaintiff's testimony regarding his work activities in no way undermines the adequacy or competency of Paret's opinion.

Accordingly, we reject the defendant's argument that the board's affirmance of the commissioner's findings should be reversed.

## II

The defendant's final claim on appeal is that the commissioner erred in failing to grant the defendant's motion for articulation.[17] Specifically, the defendant argues that articulation was needed to remedy "the lack of analysis or explanation as to how the trier was able to conclude that there was a substantial permanent aggravation of an underlying preexisting left knee condition . . . ." The plaintiff responds that the defendant's motion for articulation "was an attempt to characterize one of . . . Paret's reports in a way that [it] hoped would support [its] arguments on appeal. The commissioner obviously did not accept the [defendant's] characterization of that report, and was acting within his discretionary powers in denying the motion for articulation." We conclude that the commissioner did not abuse his discretion in denying the request for articulation.

The following additional procedural history is relevant. Following the issuance of the commissioner's decision, the defendant filed a motion to correct and request for articulation. In its motion, the defendant sought fourteen corrections to the commissioner's findings, conclusions, and orders, and it requested an articulation. In its request for articulation, the defendant cited the commissioner's finding regarding Paret's February 8, 2012 office note, which referenced the plaintiff's three, twelve hour shifts pushing heavy carts and resulting swelling of his knees. The note further stated that "the effusion is rather significant. I believe it was caused by his work-related efforts pushing very heavy racks of gears working [twelve] hours a day for several days in a row. He has moderately severe degenerative joint disease which has been aggravated now by his work-related injury." The defendant requested that the commissioner "articulate or otherwise confirm that [his finding referencing Paret's February 8, 2012 note] merely illustrates that (1) the work-related activities related to pushing racks of gears caused only effusion or swelling in the left knee and (2) that the statement by . . . Paret suggests the effusion ('it') has aggravated moderately severe degenerative joint disease without any comment on the extent of [the] aggravation whether temporary or otherwise." The defendant argued that "[t]his request is necessary to clarify the commissioner's conclusion and to identify the work injury cited by

the trier." The defendant maintained that Paret discussed "swelling in the knee and does not identify the nature or extent of the aggravation caused by such swelling . . . ."

On appeal to the board, the defendant argued that the commissioner improperly denied its motion to correct and request for articulation. With respect to the request for articulation, the board determined that "[i]t is clear that the finding in question merely reflects Paret's statements regarding causation as recited in his February 8, 2012 office note, which note is consistent with Paret's opinion on causation as expressed in his other office notes and correspondence."

"[A]n articulation is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification. . . . [P]roper utilization of the motion for articulation serves to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening the issues on appeal. . . . In workers' compensation cases, motions [for articulation] are granted when the basis of the commissioner's conclusion is unclear." (Citations omitted; internal quotation marks omitted.) *Cable* v. *Bic Corp.*, 270 Conn. 433, 444–45, 854 A.2d 1057 (2004).

In the present case, the commissioner expressly credited and relied on Paret's opinions, particularly with regard to the impact of the plaintiff's work activities on his ultimate need for a left knee replacement. We agree with the board that the finding with respect to which the defendant sought an articulation, when considered together with Paret's office notes and communications, reflected Paret's opinion that the plaintiff's work activities aggravated his degenerative joint disease. Accordingly, we conclude that the commissioner did not abuse his discretion in denying the defendant's request for articulation and that the board did not improperly affirm that decision.

The decision of the Compensation Review Board is affirmed.

In this opinion the other judges concurred.

[1] AIG Claims, Inc., the workers' compensation insurer for Sikorsky Aircraft Corporation, is also a defendant in this case. For convenience, we refer in this opinion to Sikorsky Aircraft Corporation as the defendant.

S. Marino's Honda City, the plaintiff's former employer, and its insurer, ACE USA-Chubb, were also parties in the proceedings before the workers' compensation commissioner. They are not participating in this appeal.

[2] The defendant also claims that the board erred in relying on *Garofola* v. *Yale & Towne Mfg. Co.*, 131 Conn. 572, 574, 41 A.2d 451 (1945), to conclude that expert medical evidence was not necessary to determine the role of the plaintiff's workplace activities in substantially and permanently aggravating his preexisting degenerative arthritis in his left knee, resulting in the need for a total left knee replacement. Because we conclude that the commissioner's finding of causation is supported by expert medical evidence in the record, we need not address the propriety of the board's reliance on *Garofola*.

The defendant raises an additional claim on appeal that the manner in which the board reached its conclusion is inconsistent with the board's

decisions in prior cases. Specifically, he claims that the board misapplied case law with respect to the "concept of considering medical evidence along with other evidence to determine whether an injury is related to the employment." Because this issue is addressed in part I of this opinion, we need not separately address this claim. See footnote 16 of this opinion.

[3] The plaintiff thought that he saw Richard Campbell-Jacobs, a physician, when he first injured his knee, but he did not receive any treatment until his surgery. The plaintiff did not pay for medical treatment for his left knee in 1972, nor did he lose time from work before the 1973 surgery. He does not remember whether he was paid for his time out of work after his surgery in 1973. The plaintiff asked for a scar award hearing, and it was held on August 15, 1978. The commissioner made an award of six weeks, but the plaintiff does not remember if he was paid. He does not recall receiving a disability rating from Campbell-Jacobs or being paid for any such rating.

[4] The deposition transcript of Marino, who employed the plaintiff as a mechanic in his motorcycle shop, was entered into evidence at the hearing. Marino testified that he did not recall the plaintiff having had a left knee injury and that he did not receive or pay any bills on behalf of the plaintiff. He testified that if anyone had been injured on the job, he would have remembered it.

[5] The plaintiff injured his right knee while working for the defendant in 1985. In its principal appellate brief, the defendant notes that it "acknowledged compensability of replacement on the right knee because of that incident which was clearly a significant factor in subsequent degeneration." The right knee injury is not at issue in the present appeal.

[6] The commissioner further found: "Given the time that has passed since the [plaintiff's] alleged left knee injury at [Honda] on June 28, 1972, along with the lack of documentary evidence supporting the claim, the testimony of the [plaintiff] and . . . Marino were not at all persuasive. . . . The [plaintiff] failed to prove that he made a timely claim for the alleged June 28, 1972 injury, and also failed to prove that the commission would have jurisdiction over the claim under any of the exceptions set forth in [General Statutes §] 31-294c (c)."

[7] The commissioner stated that, "[a]lthough the [plaintiff] asks in his proposed findings that the payment of indemnity benefits be ordered, this issue was not noticed for the formal hearing. Future hearings may be held to address this issue if the parties are unable to reach a resolution."

[8] When asked whether the plaintiff told Lena what course of treatment he wanted to pursue, Lena replied: "I don't recall exactly what he said. As you know, during an employer/respondent examination, we don't discuss too much."

[9] Specifically, he testified: "On the housings, on the transmission housings on the Blackhawk, that was the heaviest fixture. That was 1400 pounds. They did make a smaller one and lighter one down to probably, down to probably 500 pounds later on, probably 10 years ago. The fixtures for the main rotors for like our largest aircraft, which was the CH53's and stuff, those fixtures were up to [1000] pound weights."

[10] See footnote 5 of this opinion.

[11] The defendant, in its principal brief before this court, states that "[t]here is no evidence in the record that the [defendant] acknowledged repetitive trauma with respect to the right knee notwithstanding . . . Paret's comments to counsel. The rationale on the right total knee replacement is different and not relevant, and the resolution of the right knee claim should have no bearing on the analysis of the left knee claim." We note Paret's reference to the right knee only because it contextualizes his discussion of the pushing and pulling activities as aggravating the plaintiff's arthritis in his left knee.

[12] The parties dispute whether the plaintiff had the benefit of "mechanical assistance" in retrieving the fixtures. With respect to retrieving the fixtures from the fixture crib, the commissioner found that "if he couldn't get a tow motor operator to get the fixture, he would need to do so with a pallet jack or floor jack." With respect to retrieving the fixtures stored across the aisle, which task would be performed approximately two or three times per day, the commissioner found that the plaintiff used a pallet jack. The plaintiff further testified that he would pull parts weighing 800 to 900 pounds using a hand truck.

In his deposition, the plaintiff was asked what a hand truck is, and he responded, "A hand truck is like a pallet jack." He testified that it "lifts the pallet" and then "you pull it." He confirmed that he would move it with his own power. The defendant mentions in its brief that Paret's opinion was

premised on the plaintiff pushing and pulling heavy fixtures "without mechanical assistance," however, we note that Paret's full statement provides that the plaintiff was "responsible . . . for pulling very heavy loads weighing up to 1400 pounds *on pull carts* with no mechanical assistance . . . ." (Emphasis added.) We see no conflict among Paret's opinion, the plaintiff's testimony, and the commissioner's findings with respect to the assistance available to the plaintiff to move the fixtures and parts.

[13] The record in *Marandino* also contained a November, 2000 note authored by the plaintiff's treating physician that stated: "I feel that there is [a] direct related cause of the knee injury to the right elbow pre-existing problem." (Emphasis omitted; internal quotation marks omitted.) *Marandino* v. *Prometheus Pharmacy*, supra, 294 Conn. 588. This court and our Supreme Court declined to address the defendant's claim on appeal that the November, 2000 note improperly was admitted into evidence, on the basis that it was cumulative of the April, 2002 letter, to which the defendants had not objected. Id., 588 n.13.

[14] The defendant relies on *Avino* v. *Stop & Shop Supermarket Cos. LLC/ Ahold USA*, No. 5820, CRB 3-13-2 (February 10, 2014) as setting forth the type of medical evidence *required* to establish work-related aggravation of preexisting arthritis such as the plaintiff had in the present case. In that case, the commissioner found that the plaintiff's preexisting osteoarthritis was " 'accelerated by the employment activity' " and, therefore, that his injury was compensable. The plaintiff had undergone medial and lateral open meniscectomies when he was a teenager, and his treating physician testified that these procedures typically lead to osteoarthritis. The plaintiff began treating forty years following the surgeries for bilateral knee pain, at which time his physician diagnosed him as suffering from bilateral end-stage degenerative joint disease of the knees. The physician testified that the heavy work performed by the plaintiff as a meat cutter had exacerbated his knee symptoms. He described the arthritic changes in the plaintiff's knees as " 'probably multifactorial,' " and opined that the plaintiff probably would have developed significant arthritis in his knees " 'whether or not he worked as a meat cutter.' " However, he further opined that the work activities of the plaintiff, particularly heavy lifting and deep squatting, likely had " 'aggravated his underlying condition and required him to have replacement earlier than he potentially would have had he had a more sedentary job.' " Another physician performed a medical examination at the request of the defendant and determined that the plaintiff's duties as a meat cutter had aggravated his osteoarthritis but were not a substantial contributing factor in its development.

The board found that the record provided "ample support" for the commissioner's conclusion that the plaintiff's job duties were a significant contributing factor to his need for knee replacement surgery.

We agree with the defendant that the medical evidence presented in *Avino* is stronger than that presented before the commissioner in the present case. We disagree, however, that the medical evidence in the present case was so lacking that it could not support the commissioner's finding of causation.

[15] In its reply brief, the defendant contends that "[w]hile . . . Paret was of the opinion moving up to the 1400 pound parts aggravated the plaintiff's left knee condition, this is at best an undefined aggravation." It maintains that there is no comment from Paret that the plaintiff's work activities "permanently aggravated his left knee condition." The defendant states that "a left knee effusion was present" in February, 2012, but that the effusion had resolved by the time of surgery in February, 2015. We note, however, that Paret's records indicate that he had recommended surgery as early as February, 2012, and that, by March 14, 2012, the plaintiff was considering surgical options of a total knee replacement because Paret thought that "there is very little else that we can offer other than the very conservative management treatment course which has been ineffective so far."

[16] We note here the defendant's claim on appeal that the board's decision "represents a departure from the procedure which guides all counsel within the [workers' compensation] system on a daily basis." See footnote 2 of this opinion. In support of this claim, the defendant argues that the board has "misapplied the reference in *Murchison* [v. *Skinner Precision Industries, Inc.*, supra, 162 Conn. 152] with respect to the concept of considering medical evidence along with other evidence to determine whether an injury is related to the employment. . . . The court did not suggest that an opinion expressed with reasonable medical probability as to whether the work activity was a substantial contributing cause was no longer necessary. Rather, competent and probative medical testimony is necessary which is then viewed through the lens that considers the other evidence produced in the case." (Citation omitted.) Because we conclude that the commissioner

had before him competent medical evidence, we need not address the defendant's argument that it is improper to supplement incompetent medical evidence with other evidence.

[17] The defendant does not claim on appeal that the commissioner abused his discretion in denying its motion to correct.

---